UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BIG BEINGS USA PTY LTD, and <br> LB ONLINE & EXPORT PTY LTD d/b/a <br> LOVE TO DREAM ONLINE AND <br> EXPORTS, <br> <br> Plaintiffs, <br> <br> v. <br> NESTED BEAN, INC., <br> <br> Defendant. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> Civil Action No. 20-cv-10101-IT |

ORDER ON CLAIM CONSTRUCTION

October 20, 2020

Plaintiffs Big Beings USA PTY LTD and LB Online & Export PTY LTD d/b/a Love to Dream Online and Exports ("Love to Dream" or "LTD") allege that Defendant Nested Bean, Inc. ("Nested Bean") has infringed their rights to U.S. Patent No. 9,179,711 ("the '711 Patent"). This patent is directed to a new or alternative "swaddling suit" that provides sufficient restraint while also allowing an infant's hands to move towards the infant's mouth in order to allow for self-soothing. The court held a claim construction hearing on an expedited basis in order to resolve the construction of a single term[1]—"positioned above a level of the neck hole"—on the parties' representation that construction of this term would facilitate formal or informal resolution of this case. For the reasons set forth below, the court construes the term to mean "positioned above a horizontal plane drawn at the highest point of the neck hole."

---

[1] LTD initially requested expedited construction of the terms "wing portion" and "swaddling suit." See Joint Statement 2 [#45]. At the claim construction hearing, LTD withdrew its request for construction of these two terms.

I.  LEGAL FRAMEWORK

The construction of claim terms is a question of law. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court"). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." Id. at 1313. In construing claim terms, courts look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)). The court briefly reviews how these sources are used in claim construction as relevant here.

A.  The Language of the Claims

Because "the claims of a patent define the invention to which the patentee is entitled the right to exclude," the claim construction analysis begins with the claims themselves. Phillips, 415 F.3d at 1312 (quoting Innova, 381 F.3d at 1115). "[T]he context in which a term is used in the asserted claim can be highly instructive." Id. at 1314; see also id. ("This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term"). For example, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the

same term in other claims." Id.

  B. The Specification

The claims "do not stand alone" but "are part of a fully integrated written instrument consisting principally of a specification." Phillips, 415 F.3d at 1315 (internal citation omitted). "For that reason, claims 'must be read in view of the specification, of which they are a part.'" Id. (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)).

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. (quoting Vitronics, 90 F.3d at 1582). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Id. at 1316; see also CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (stating that an inventor may "act[] as his own lexicographer" by "clearly set[ting] forth a definition of the disputed claim term in . . . the specification"). "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." Phillips, 415 F.3d at 1316. Nevertheless, the court must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." Id. at 1323; see also id. ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"). While this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on

understanding how a person of ordinary skill in the art would understand the claim terms." Id.

C. The Patent Prosecution History

Courts should also consider the patent's prosecution history if it is in evidence. Id. at 1317. Prosecution history comprises the record of the proceedings before the United States Patent and Trademark Office ("USPTO"), both pre- and post-issuance proceedings, and prior art cited during the examination of the patent. Id.; see also Aylus Networks, Inc. v. Apple Inc., 856 F.3d 1353, 1360 (Fed. Cir. 2017) ("[e]xtending the prosecution disclaimer doctrine to [inter partes review] proceedings will ensure that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers"). "Like the specification, the prosecution history provides evidence of how the USPTO and the inventor understood the patent." Phillips, 415 F.3d at 1317. The prosecution history can also provide evidence as to "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. "Yet because the prosecution history represents an ongoing negotiation between the USPTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id. As a result, courts must "not rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal." 3M Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1322 (Fed. Cir. 2013); see Aylus Networks, 856 F.3d at 1359 ("when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered") (citing Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090, 1095

(Fed. Cir. 2013)).

## II. ANALYSIS OF THE DISPUTED TERM

The '711 Patent, titled "Swaddling Suit," is directed to a new or alternative "swaddling suit." The invention provides sufficient restraint of the limbs so as to suppress an infant's startle reflex while still allowing the infant's hands to move towards the infant's mouth, which facilitates non-nutritive sucking so as to allow the infant to self-soothe. '711 Patent, Abstract [#1-1].

The disputed term appears in independent claims 1 and 2, to which all other claims in the patent depend. Claim 1, which is representative of claim 2 for the purposes of claim term at issue, recites:

> 1. A swaddling suit for swaddling an infant comprising,
> an upper portion for enclosing the infant's upper body, wherein the upper portion includes
> (a) a bodice portion, and
> (b) a neck hole at an uppermost central portion of the bodice portion, and
> (c) wing portions comprising one wing portion of the swaddling suit on one side of the bodice portion and another wing portion of the swaddling portion on another side of the bodice portion, said one wing portion and said another wing portion extending laterally from the bodice portion at an uppermost portion of the suit,
> each of said one wing portion and said another wing portion having a wing tip at an uppermost portion of each of the wing portions that is <u>positioned above a level of the neck hole</u> of said suit,
> each of said wing portions being large enough to completely surround and retain an infant's arm and hand in a hand-raised and elbow-bent position,
> said swaddling suit being tapered in at a waist line below said wing portions and then widening whereby a narrowest region of said suit is at said waist line.

'711 Patent, Claim 1, as corrected in Certificate of Correction issued Nov. 10, 2015 (disputed term underlined).

At issue is the proper construction of the term "positioned above a level of the neck hole." Patent holder LTD asks the court to construe the term to mean "positioned above a plane drawn across two points of a neck hole." Joint Statement 1 [#45]. Defendant Nested Bean argues that the court should construe the term to mean "positioned above the highest point of the neck opening of

5

said suit." Id. The court construes the term to mean "positioned above a horizontal plane drawn at the highest point of a neck hole" for the reasons set forth below.

The court starts with the plain language of the claim. LTD argues that its proposed construction is faithful to the language of the claim since the claim is not referencing any specific "level" but *any* line or plane that may connect two points of the neck hole. Pls.' Mem. 7 [#54]. LTD further argues that Nested Bean's construction is "improperly" injecting the words "highest" and "point" into the claim language. Id. at 8.

The court agrees that the disputed term is referencing a "level" rather than a "point." But it is LTD's construction, not Nested Bean's, that makes substantive changes to the claim's meaning by suggesting that the reference level is a plane created between *any* two points of the neck hole.[2] The plain meaning of the claim language, which "ordinarily controls," does not suggest a multiplicity of reference lines at any height or angle with the only limit on the reference line being that it transects any two points of the neck hole. InterDigital Commc'ns, LLC v. Int'l Trade Comm'n, 690 F.3d 1318, 1324 (Fed. Cir. 2012). Nor is there support for the proposed construction in the "context in which [the] term is used in the asserted claim," which often proves

---

[2] Implicit in LTD's argument is the proposition that "a level of the neck hole" is equivalent in meaning to "*any* level of the neck hole." But LTD provides no support for the proposition that the drafter's use of "a" means "any." Instead, as Nested Bean argues, the indefinite article "a" is often employed when drafting written descriptions so as to differentiate terms that have already been introduced and terms that have not. Def.'s Reply 6–9 [#57] (citing Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1343 (Fed. Cir. 2008) (citing MPEP § 2173.05(e))). Here, the court need not speculate as to whether the patentee was subscribing to this custom since the prosecution history makes plain that she was. During prosecution, the examiner explicitly suggested that the Applicant amend the claims to use the indefinite article "a" instead of the definite "the" where those terms lacked an antecedent basis. See Non-Final Office Action 5–9 [#22-7]. The Applicant adopted these proposed changes, including with reference to the "shoulder line." See Response to Non-Final Office Action 9–18 [#22-8]. The examiner continued to employ this usage when she amended the claim language to read "a level of the neck hole."

"highly instructive." Phillips, 415 F.3d at 1314. Here, the context in which the term is used is as a reference level, and LTD's suggested construction eliminates any meaningful reference level.

The court finds instead that the plain and ordinary meaning of the claim language favors a construction where what is being disclosed is a swaddling suit where the wing tips (i.e., the uppermost portion of each wing portion) are "positioned above . . . the neck hole." That the claim inserts the term "a level of" into this phrase does not convey, in the court's opinion, that the wing tips must reach above any line that can be drawn through the neck hole, but simply clarifies that the patentee is not limiting the claim to embodiments where the wing tips are positioned <u>directly</u> above the neck hole. Instead, the ordinary meaning of the claim terms recite wing tips that extend above a horizontal line at the highest point of the neck hole, including where the wing tips are positioned above the shoulders rather than above the neck hole. And while LTD complains that the terms "highest" and "point" appear nowhere in the claim, <u>see</u> Pls.' Br. 8 [#54], it is axiomatic that the wing tip cannot extend "above" the neck hole unless at least a portion of the wing tip is located above the highest point of the neck hole. In this way, Nested Bean's proposed construction, as modified by the court, elucidates the meaning of the terms themselves while LTD's proposed construction changes the plain and ordinary meaning of the phrase to mean something different.

Nested Bean's proposed construction, as modified by the court, is also buttressed by the specifications. The specifications do not define the term "a level of the neck hole" nor use the term in a manner that favors one construction over another. But even without explicitly or implicitly defining the term, the specifications provide context for how "a person of ordinary skill in the art would understand the claim terms." Phillips, 415 F.3d at 1324. Here, the specifications convey that the claimed invention is a swaddling suit that can not only sufficiently constrain an

infant so as to suppress the startle reflex, but also allow for the infant's arms to reach towards the mouth to facilitate non-nutritive sucking and allow for self-soothing. '711 Patent col. 5, l. 66–col. 6, l. 5 [#1-1]. To that end, the specifications provide that "[b]y restricting movement of the hand(s) to 180 degrees at or above the shoulder line, the swaddling suit [] overcomes the problem of prior art swaddling suits that deny access of hands towards the mouth." Id. col. 7 ll. 22–25. Although not dispositive, this description of the invention indicates that what is being claimed is a suit that biases the infants' hands upwards, to be "at or above the shoulder line." Id. This stated description of the invention does not comport with LTD's construction that would have the wing tips extend beyond any artificial plane created by the neck hole, particularly where the neck hole may have an unconstrained lower bound that reaches toward the navel as in some of the prior art. See WO 2007/098558 12 ("Moss") 12 [#53-2]. Instead, the specifications lend support for construing the claim as disclosing wing tips that must extend upward above a certain horizontal level.

Big Being's construction is further undermined by the prosecution history. At several points during prosecution of the patent, the examiner noted how the vertical reach of the wing tips was critical to differentiating the claim from the prior art so as to avoid issues of anticipation or obviousness. For example, in an Applicant-Initiated Interview Summary 2–4 [#22-14], the examiner noted that during a March 26, 2015 conference, the examiner discussed two pieces of prior art, "Moss" and "Greiert," and her view that they rendered the claimed invention obvious. Id. (referencing Moss [#53-2]; U.S. Patent No. 3,259,126 ("Greiert") [#53-6]). The examiner memorialized in the interview summary that she "specifically suggested that Applicant consider amending the claims to include language . . . directed to disclosure of the structure of the wing tips that extend above the shoulder line of the suit such as in the embodiment shown in figures

5a/5b because it appears as though the prior art of Moss and Greiert confine a baby's arms to at or below the shoulder line of the suit." Id. Following the interview, the Applicant amended the claim language to disclose wing tips "extending *toward* a shoulder line of said suit." Response to Office Action 4 [#22-15] (emphasis added). The examiner rejected this proposal and cited the interview summary to point out that she had previously "suggested further amending the claims to include limitations to define that the wing tips extend ABOVE the shoulder line of the suit . . . to differentiate the claimed invention from the prior art." Advisory Action 3–4 [#22-16] (emphasis in original). In the rejection, the examiner complained that the suggested limitation had "not been incorporated into the clams" in the most recently filed amendments but that instead "Applicant has presented several entirely new limitations which were not discussed in the interview and . . . has removed claim limitations which were previously part of the claims." Id. at 4. In response, the Applicant then revised the claim again to incorporate the language initially suggested by the examiner (i.e., "having a wing tip that extends above a shoulder line of said suit"). Second Response to Second Final Office Action 2, 10–11 [#22-17].

After the Applicant incorporated the examiner's suggestion that the wing tips extend above the shoulder line, the examiner issued a Notice of Allowability [#22-18]. However, the notice included an amendment made by the examiner that had been authorized by the Applicant in a phone interview shortly before the Notice of Allowability issued. The examiner's amendment replaced the limitation that the wing tips "extend[] above a shoulder line" with the limitation that the wing tips are "positioned above a level of the neck hole of said suit." Id. at 9. In her Statement of Reasons for Allowance, the examiner wrote that the prior art did not teach wing tips "positioned *above* a level of a neck hole of the suit." Id. at 12 (emphasis in original). Instead, the examiner noted that the Greiert prior art disclosed the "outer ends of arm portions 22 [being]

9

positioned at the same level of the neck opening 27." Id. Accordingly, the examiner allowed the patentee to claim wing tips "positioned above a level of a neck hole." Id.[3] The relevant figure of the Greiert prior art is depicted below:



Greiert, Figure 3 [#53-6].

LTD contends that the file history "in no way whatsoever runs contrary to LTD's proposed construction" and that Nested Bean is "conflating 'neck line' with 'shoulder line'" since "LTD was responding to the Examiner's question regarding whether certain prior art references disclosed wing tips above the <u>shoulder line</u>." Pls.' Br. 10 [#54] (emphasis in original). Even taking LTD's point for the purpose of argument, it does not lend support to LTD's proposed construction. There is at least no dispute that the examiner had concluded that the claimed wing

---

[3] It is not apparent why the examiner no longer thought that the shoulder line was a suitable reference point. One possible explanation is that the examiner thought that the prior art, namely Greiert, disclosed the arms reaching above the shoulder line but not above the level of the neck hole. Another possible explanation is that the examiner thought that the shoulder line of the swaddling suit was not an adequate reference point since, as in the embodiment depicted in Figure 4B of the '711 Patent, the suit may not rest on the infant's shoulders when worn, thus making the shoulder line somewhat amorphous.

tips must extend *at least* above the shoulder line and LTD acknowledged this concern with an amendment. But now LTD proposes a construction that would render the disclaimer as to the shoulder line—which LTD effectively concedes to have been disclaimed—meaningless where the swaddling suit has a neck opening that extends below the shoulder line. At the claim construction hearing the court inquired regarding this issue and counsel for LTD responded that a person of ordinary skill would understand that a neck hole could not extend below the shoulder line. However, that position is controverted by the prior art references that describe a neck hole extending well-below the shoulder line, as in Moss:



Moss 12 [#53-2].[4] Thus, even if LTD is correct to argue that all the patentee disclaimed were

---

[4] Moss describes reference number 34 as the "edge" of the "aperture", the aperture being reference number 20.

wing tips that did not extend above the shoulder line, that disclaimer would still foreclose LTD's proposed construction.

LTD also argues that there is enough ambiguity in the prosecution history such that there is no "clear and unmistakable" disavowal of the claim scope, as required by law. Pls.' Reply 6 [#56] (citing Cont'l Circuits LLC v. Intel Corp., 915 F.3d 788, 798 (Fed. Cir. 2019)). But LTD's argument that the prosecution history must show a clear and unmistakable disavowal is rooted in the premise that the court would be looking to the prosecution history to limit the claim scope. That is not the case here. Here, for the reasons set forth above, the intrinsic evidence supports the construction that the wing tips must extend above the neck hole. In this case, the prosecution history is not providing a disclaimer of claim scope but instead corroborating the plain and ordinary meaning of the claim terms in light of the specification.

Beyond the intrinsic and extrinsic record, LTD's proposed construction is fatally flawed *ab initio* as indefinite. LTD's proposed construction changes the term "above a level of the neck hole" from a limitation with discernable meaning to one with none at all. As such, the term would be indefinite. See Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 911 (2014) (terms are indefinite where its meaning cannot be ascertained by someone of ordinary skill with reasonable certainty).

LTD does not attempt to refute this concern but simply argues that the indefiniteness issue "should be deferred until summary judgment." Pls.' Br. 5 [#56]. While there are often good reasons to defer considerations of indefiniteness to summary judgment—including the higher burden of invalidating a claim based on indefiniteness—LTD provides no support for the position that it is proper for a court to ignore that a proposed construction is plainly indefinite. Where "indefiniteness is a matter of claim construction" and the underlying objectives of claim

construction are to clarify the scope of the claims, it makes little sense to adopt a construction that would then render a claim's meaning unascertainable to either a person of ordinary skill or to a juror. See Chapco, Inc. v. Woodway USA, Inc., No. 3:15-CV-1665 (JCH), 2016 WL 7168375, at *3 (D. Conn. Dec. 8, 2016) ("the court should . . . not construe a term such as to render it indefinite") (citing Exxon Res. & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) abrogated on other grounds by Nautilus, 572 U.S. 898 (2014)). Accordingly, the court will not do so here.

III. CONCLUSION

For the reasons stated above, the court construes the term "positioned above a level of a neck hole" to mean "positioned above a horizontal plane drawn at the highest point of the neck hole."[5] As discussed at oral argument, the parties shall meet and confer and promptly file a status report regarding a schedule for these proceedings and whether the parties seek to pursue ADR.

IT IS SO ORDERED.

Date: October 20, 2020

/s/ Indira Talwani  
United States District Judge

---

[5] The court does not construe the words "positioned" and "neck hole." The court understands that the accused infringing product may contain wing portions with wing tips that reach above the "neck hole" when the suit is worn by the infant but not when the suit is laid on a flat surface. Whether such a product would infringe the '711 Patent is not a question properly before the court here. Furthermore, at oral argument the court inquired as to whether a collar or a hood would constitute part of the "neck hole." Defendant Nested Bean stated that it would. The court does not adopt this construction of "neck hole" for the purpose of this decision and may address the construction of "neck hole" at a later date if construction is material to the parties' dispute.